UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

M.J., an infant, by her Parent and Natural
Guardian, CASEY JOHNSON,

                             Plaintiff,

      v.                                          7:09-cv-076

UNITED STATES OF AMERICA, and SAMARITAN
MEDICAL CENTER,

                             Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THOMAS J. McAVOY
Senior United States District Judge

## **DECISION and ORDER**

Plaintiff Casey Johnson, on behalf of her infant daughter, M.J., commenced the instant action seeking to recover damages for injuries sustained by M.J. during and in the course of her birth. Presently before the Court is Defendant Samaritan Medical Center's motion for summary judgment pursuant to Fed. R. Civ. P. 56 seeking dismissal of the Complaint in its entirety.

**I.    FACTS**

At 1:05 p.m. on September 21, 2006, Plaintiff Casey Johnson, who was pregnant, presented to Samaritan Medical Center ("SMC") with a spontaneous rupture of her membranes. Plaintiff was initially evaluated by Nurse Sheila Marie who contacted Midwife Kristin Lewis. Lewis performed an artificial rupture of Plaintiff's membranes, revealing clear fluid. At 1:40 p.m., Lewis admitted Plaintiff to the labor and delivery unit. Lewis's

examination revealed that Plaintiff was 2 to 3 cm. dilated, 70% effaced,[1] and at -2 station[2] with an estimated fetal weight of 8.5 lbs. At 12:30 a.m., Plaintiff was administered Pitocin, a drug that augments contractions.

The next morning (September 22) at 7:20 a.m., Nurse Toni Bonville assumed the nursing care for Plaintiff. Plaintiff's progress was slowing and the fetal heart rate was reassuring in the 120 to 130 range with positive short term variability.[3] At around 8:06 a.m., Bonville discussed and encouraged Plaintiff to begin pushing because she was entering stage two of labor. The fetal strips continued to be reassuring and the attending physician, Dr. Silva, saw Plaintiff at around 9:30 a.m. Dr. Silva noted continued reassuring progress of labor and documented complete dilation and effacement with fetal position at +2 station. Dr. Silva assessed the fetal heart and found it to be reassuring (in the 120 to 130 range) with mild variability when pushing. Plaintiff was noted to have been pushing for an hour. Vaginal examination revealed thin to moderate meconium.[4] The baby's head was found to be slightly angled toward the mother's left hip looking down diagonally at the floor, which is a normal

---

[1] Effacement refers to the thinning of the cervix.

[2] Fetal station is the "relationship between the presenting part of the baby . . . and two parts of the mother's pelvis called the ischial spines. . . . If the presenting part lies above the ischial spines, the station is reported as a negative number from -1 to -5 (each number is a centimeter). If the presenting part lies below the ischial spines, the station is reported as a positive number from +1 to +5." http://www.nlm.nih.gov/medlineplus/ency/article/002060.htm (accessed Sept. 25, 2012).

[3] Variability refers to fluctuations in the fetal heart rate.

[4] "Meconium is the early feces (stool) passed by a newborn soon after birth, before the baby has started to digest breast milk (or formula)." http://www.nlm.nih.gov/medlineplus/ency/article/001596.htm (accessed Sept. 25, 2012).

position.[5] Dr. Silva's plan was to continue to have the patient push with Pitocin augmentation and to reassess regularly. Plaintiff's progress continued to be monitored by the nursing staff.

Dr. Silva again saw Plaintiff at approximately 10:30 a.m. He documented that Plaintiff continued to push with good effort and that the fetal heart rate tracings were reassuring in the 140s with occasional mild variables with pushing.[6] At around 10:51 a.m., Nurse Bonville noted that she could see the caput,[7] but that the baby's head was not presenting for delivery.[8] At approximately 11:30 a.m., Dr. Silva re-assessed Plaintiff. Upon examination, Dr. Silva noted that Plaintiff no longer had good fetal descent with pushing, that she had made little progress, and was only at +4 station. Dr. Silva saw no findings indicative of fetal distress and was not concerned with the fetal heart rate. Due to a lack of progress, Dr. Silva determined that there was a lack of descent and called Dr. Lural for a second opinion. In light of the baby's estimated size, Dr. Silva wished to proceed with a c-section, rather than an operative-assisted vaginal delivery. Dr. Silva did not believe the arrest of descent to be an emergent situation, particularly in light of the lack of persistent or severe

---

[5] Plaintiff's expert opines that, after birth, clinical indications showed that the fetus was in an abnormal presentation because she was deflexed and asynclitic (presenting not with the crown, but with the back, left side of her head and with part of her brow up against the vertex). Plaintiff's expert states that, in light of the likely position of the fetus, as the mother was pushing, the fetus' head was repeatedly being forced, wedged and compressed into the mother's pelvic bone. It is claimed that the administration of Pitocin exacerbated the pressure on the fetus' head.

[6] In her opposing statement of material facts, Plaintiff denies that she pushed with good effort and that the fetal heart rate tracings were reassuring. See Pl.'s Resp. Stmnt. Mat. Facts at ¶ 14. Because, however, Plaintiff does not cite to portions of the record supporting this denial, these facts, which are set forth in Defendant's Statement of Material Facts and are supported by citations to the record are deemed admitted. See N.D.N.Y.L.R. 7.1(a)(3). In all other instances where denials are not supported by specific citations to the record, the facts will be deemed admitted.

[7] The "Caput succedaneum is swelling of the scalp in a newborn. It is most often brought on by pressure from the uterus or vaginal wall during a head-first (vertex) delivery." http://www.nlm.nih.gov/medlineplus/ency/article/001587.htm (accessed September 20, 2012).

[8] According to Plaintiff, this suggests that there was an abnormal presentation.

decelerations in the fetal heart rate and/or any clinical findings that were suspicious or indicative of fetal distress or compromised fetal well-being.

Shortly after 12:00 p.m., Dr. Lucal evaluated Plaintiff and agreed that there was an arrest of descent. Dr. Lucal also agreed that performing a c-section, rather than operative-assisted vaginal delivery, was reasonable. Dr. Lucal testified that there was no fetal distress present and that a c-section was warranted solely due to arrest of descent. The baseline heart rate was around 170 with diminished variability.[9] The decision to perform a c-section was made at 12:12 p.m. due to arrest of descent and fetal intolerance to labor.

At 12:15 p.m., Dr. Silva noted that some of the fetal heart tracings appeared to be that of the maternal heart rate and not that of the baby. Dr. Silva examined the fetal heart rate and found that the maternal tracings always reverted back to the tracings of the fetal heart rate, which were reassuring, with good beat-to-beat variability. Drs. Silva and Lucal were present during the times the maternal heart rate was inadvertently traced. Neither Drs. Silva nor Lucal saw any clinical evidence from their respective examinations or of the fetal strips that there was fetal distress at any time during the labor and delivery.

Dr. Silva communicated to Nurse Bonville his decision to perform a non-emergent c-section at around 12:10 p.m. The surgery was delayed for 20 - 30 minutes because the local anesthetics were not taking effect and, therefore, they had to wait for the anesthesiologist. The c-section began at 1:34 and the baby was delivered at 1:47 p.m.

---

[9] Plaintiff's expert opines that decreased long-term variability becomes significant if it does not go away or correct itself within a 10 to 20 minute interval. Plaintiff's expert further opines that there was evidence of fetal distress beginning at or around 8:00 or 8:30 a.m. and that there was decreased long-term variability in excess of the 10 to 20 minute interval, thereby suggesting the need for an urgent c-section (within 30 minutes). Prolonged deviations from a normal baseline heart rate can indicate fetal hypoxia (lack of oxygenation). Loss of variability similarly can be indicative of a problem.

At the time of delivery, the baby weighed 9 lbs and 10 oz and had Apgar scores[10] of 1, 7, and 7 and a large amount of meconium was observed in the uterus. The infant's clinical condition at birth was near death with no vital signs other than a slow heart rate of 60 beats per minute. The baby was limp, lethargic, lifeless, and had no spontaneous respirations. At this point, the neonatal team took over the care and treatment of the infant. An umbilical cord arterial blood was obtained, revealing a pH of 7.168, a pCO2 of 62.5, a pO2 of 16.6 and base excess of -7.8. At 9:30 a.m. on September 23, 2006, the infant was transferred to Crouse Hospital. A CT scan of the brain without contrast was obtained on September 27, 2006 and was interpreted as revealing no sign of brain injury or edema as only a lower left parietal/posterior left occipital cephalohematoma was noted. According to Plaintiff, the baby suffered from acute intra partum asphyxia, ischemic low-flow insult related to cord compression and head compression during second stage of labor.

As a result of the foregoing, Plaintiff commenced the instant action claiming that Defendant's negligence caused the injuries to the infant. Specifically, Plaintiff asserts that Nurse Bonville was negligent by:

- failing to properly monitor the fetal heart rate;

- improperly placing the external fetal monitor device;

- improperly monitoring the mother's heart rate instead of the fetus's beginning around 11:19 a.m. on September 21, 2006;

- failing to properly monitor the maternal heart rate;

---

[10] "APGAR is a quick test performed on a baby at 1 and 5 minutes after birth. The 1-minute score determines how well the baby tolerated the birthing process. The 5-minute score tells the doctor how well the baby is doing outside the mother's womb. . . . The APGAR rating is based on a total score of 1 to 10. The higher the score, the better the baby is doing after birth."
http://www.nlm.nih.gov/medlineplus/ency/article/003402.htm (accessed on Sept. 25, 2012).

- 5 -

- failing to determine an internal fetal monitor was necessary;

- failing to monitor Plaintiff's vital signs;

- failing to document Plaintiff's condition;

- failing to appreciate signs of fetal distress;

- failing to properly interpret fetal monitoring strips;

- failing to maintain continuous fetal monitoring;

- allowing Plaintiff to remain in protracted labor;

- failing to recommend an alternative mode of delivery to the physician;

- failing to advice the physician and/or charge nurse of the fetus's intolerance to labor;

- failing to appreciate the significance of prolonged, protracted second state of labor in a first time mother;

- failing to maintain technically adequate fetal monitor tracing every five minutes in the second stage of labor in violation of Defendant Samaritan Medical Center's policies and procedures;

- failing to anticipate the potential need for a Cesarean delivery;

- failing to appropriately monitor the fetus in the second stage of labor;

- failing to monitor the fetus every five minutes while in the operating room; and

- failing to retain fetal monitoring strips in the patient's medical record.

Presently before the Court is Defendant Samaritan Hospital's motion for summary judgment pursuant to Fed. R. Civ. P. 56 seeking dismissal of the Complaint in its entirety.

## II. STANDARD OF REVIEW

Defendants move for summary judgment pursuant to Rule 56. On a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, see Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir. 1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the movant is able to establish a prima facie basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). A party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).

## III. DISCUSSION

### a. **Breach of the Duty of Care**

Defendant first moves to dismiss on the ground that there is no triable issue of fact that it did not breach the applicable standard of care. Defendant argues that a nurse is

- 7 -

neither authorized nor responsible for making patient diagnoses, ordering medications or specialty consults, and/or determining appropriate medical treatments, including whether to perform surgical procedures and, therefore, any responsibility in this case is at the hands of the attending physicians who were monitoring Plaintiff's condition. Defendants further contend that Nurse Bonville could not have been negligent where the attending obstetrician found no evidence of fetal distress.

At deposition, Plaintiff's expert testified that Plaintiff received acceptable medical care through 10:30 a.m. on September 22. Giles Dep. at 99. Accordingly, any claims in connection with conduct before that time is dismissed for failure to demonstrate a deviation from the applicable standard of care.

In opposition to summary judgment, Plaintiff has submitted evidence from which it can reasonably be concluded that there was a deviation from the standard of care in the delay between determining that a c-section was necessary and the actual performance of the c-section. Plaintiff has similarly pointed to evidence from which it reasonably can be concluded that Nurse Bonville deviated from the appropriate standard of care by failing to properly trace and monitor the fetal and maternal heart rates, discontinue Pitocin, place (or recommend placement of) an internal fetal heart rate monitor, report changes in Plaintiff's condition or concerns of fetal distress to the attending physician, and document the maternal vitals during labor and delivery. Accordingly, the Court finds a triable issue of fact on the issue of breach of the duty of care.

### b. Causation

Defendant next contends that Nurse Bonville's failure to monitor the fetal heart rate was not the cause of the delayed c-section. In support, Defendant argues that the decision

- 8 -

to perform a c-section was due to the arrest of descent (not fetal distress) and the medical determinations of the attending physician trump those of the attending nurse thereby breaking the chain of causation. In short, Defendant argues that, because Dr. Silva was present at or around the time Bonville improperly traced the fetal hear rate, evaluated the patient, and did not identify and fetal distress, that broke the chain of causation. Defendant further claims that "[i]t would be purely speculative and highly illogical to surmise that both Dr. Silva and Dr. Lucal (who following their independent evaluations of the patient concluded that there was no fetal distress . . . ) would have deferred to Nurse Bonville's clinical judgment and ordered an emergency c-section." Plaintiff responds that a trier of fact could reasonably conclude that Nurse Bonville's failure to properly monitor the fetal heart rate and report the findings to Dr. Silva were a proximate cause to the delay in performing a C-section.

Viewing the evidence in the light most favorable to Plaintiff and drawing reasonable inferences in her favor, the trier of fact could reasonably conclude that omissions and/or failures by Nurse Bonville contributed to the failure to timely order and/or perform a C-section. There is a question of fact whether Drs. Silva or Lucal would have ordered and/or performed a c-section more quickly or otherwise would have concluded that there was fetal distress had they had accurate fetal monitoring strips or been alerted by Nurse Bonville to concerns regarding the fetal heart rate (including decreased variability), potential fetal distress, changes in Plaintiff's condition, and/or the appearance of the caput without the presentation of the baby's head for delivery. This is significant because there is evidence suggesting that time was of the essence and that some (or all) of the injuries to the infant could have been avoided if she was delivered earlier. There also remains a question of fact whether the delay caused or contributed to an acute hypoxic event. Although a trier of fact

could conclude that Drs. Silva and Lucal's independent examinations and clinical judgments "trumped" any determinations by Nurse Bonville thereby breaking the chain of causation, that any delay was due to circumstances outside of the control of Nurse Bonville, or that the delay did not contribute to the injuries at issue here, such conclusions cannot be made on the current record as a matter of law.

**IV.     CONCLUSION**

For the foregoing reasons, Defendant's motion is GRANTED IN PART and DENIED IN PART. The motion is GRANTED as to any conduct occurring prior to 10:30 a.m. on September 22[11] and the claims for lack of informed consent and vicarious liability for the acts and/or omissions of government physicians and providers.[12] In all other respects the motion is DENIED.

IT IS SO ORDERED.

Dated:   September 25, 2012

Thomas J. McAvoy
Senior, U.S. District Judge

---

[11] As noted, Plaintiff's expert opined that there were no deviations from the standard of care up until 10:30 a.m.

[12] Plaintiff consents to the dismissal of the claims of lack of informed consent and vicarious liability for the acts and/or omissions of government healthcare providers.